UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

LISA WIGGINS, and PATRICK )
CHAPMAN, both individually and as parents )
and next friends of CORBYN WIGGINS- )
CHAPMAN, a minor, deceased, )
              Plaintiffs, )
v. )
  )
1)     UNITED STATES OF AMERICA, )
ex rel. THE DEPARTMENT OF HEALTH )
AND HUMAN SERVICES; )
  )
2)     UNITED STATES OF AMERICA, )
ex. rel. PUBLIC HEALTH SERVICES; )
  )
3)     UNITED STATES OF AMERICA, )
ex. rel. INDIAN HEALTH SERVICES; )
  )
4)     UNITED STATES OF AMERICA, )
ex. rel. W.W. HASTINGS INDIAN )
HOSPITAL, )
  )
            Defendants. )
  )

Case No. _____

## COMPLAINT

Plaintiffs, Lisa Wiggins and Patrick Chapman, both individually and as the natural parents and next friends of Corbyn Wiggins-Chapman, a minor, deceased, sue Defendants set forth above and allege and state as follows:

1.     This is an action brought under the Federal Tort Claims Act for personal injury and wrongful death arising out of the negligent and/or wrongful acts and/or omissions of

1

employees, agents, apparent agents, servants, or representatives of the United States Government while acting within the course and scope of their employment, agency, apparent agency, servitude, or representative capacity, under circumstances where the United States of America, if a private person, would be liable to the plaintiffs under the laws of the State of Oklahoma where the acts or omissions occurred.  28 U.S.C.A. §1346(b).

2.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C.A. §§ 2671, *et. seq*.

3.      On April 4, 2012, Plaintiffs filed their administrative claim based on the facts alleged herein below with the appropriate federal agency, the Department of Health and Human Services (hereinafter "the Department"), for damages arising out of the personal injury sustained by and wrongful death of Corbyn Wiggins-Chapman, a minor, deceased, based on the negligence of United States Government employees, agents, apparent agents, servants or representatives practicing within the course and scope of their employment at the W.W. Hastings Indian Hospital in Tahlequah, Oklahoma.

4.      Such claims were presented as required by 28 U.S.C.A. § 2675.  The Department acknowledged receipt of Plaintiffs' administrative claims on April 11, 2012, referenced claim No. 2012-0274, and requested additional information.  Plaintiffs obtained and presented the requested information to the Department on May 15, 2012, June 15, 2012, and June 21, 2012.  A copy of the original administrative claims (without the originally-attached Exhibits "A" through "H") is attached to this Complaint as Exhibit "1."  Moreover, attached as Exhibit "2" to this Complaint is an Affidavit of Merit pursuant to 12 O.S. § 19.

5.      It has been more than six months since the administrative claims were filed with the Department.  The Department has failed to respond to Plaintiffs' administrative claims.

6.      At all times material to this Complaint, Plaintiffs Lisa Wiggins and Patrick Chapman, were permanent residents of the United States of America, residing in Muskogee County, State of Oklahoma.

7.      At all times material to this Complaint, Plaintiffs Lisa Wiggins and Patrick Chapman were the natural parents and guardians of their minor child, Corbyn Wiggins-Chapman, deceased.

8.      Plaintiffs currently reside in Muskogee County, Oklahoma.  Accordingly, venue is proper in the United States District Court for the Eastern District of Oklahoma pursuant to 28 U.S.C.A. § 1402(b).

9.      At all times material to this Complaint, W.W. Hastings Indian Hospital has been and is a hospital funded by the United States of America, the Department of Health and Human Services, Public Health Services, and Indian Health Services and is located in Cherokee County, Tahlequah, Oklahoma.

10.      At all times material to this Complaint, Defendant, United States of America, was the employer, principal and/or master of certain health care providers, including but not limited to, Dr. Sean Davis, Gina Cole, C.N.M., Rhonda Gunter, R.N., and Rachel Dick, R.N., who administered care and treatment to Plaintiff Lisa Wiggins while she was in labor with Corbyn Wiggins-Chapman at W.W. Hastings Indian Hospital.  Plaintiffs are informed and believe, and on the basis of that information and belief, allege that these health care providers were agents, apparent agents, employees, servants or representatives of the United States of America, the Department of Health and Human Services, Public Health Services, and/or Indian Health

Services, acting within the course and scope of their agency, apparent agency, employment, servitude, or representative capacity.

11.    At all times material to the Complaint, Defendant United States of America contracted with certain health care providers, including but not limited to, Dr. Sean Davis, Gina Cole, C.N.M., Rhonda Gunter, R.N., and Rachel Dick, R.N., who administered care and treatment to Plaintiff Lisa Wiggins while she was in labor with Corbyn Wiggins-Chapman at W.W. Hastings Indian Hospital.

12.    Plaintiff, Lisa Wiggins, was admitted to the W.W. Hastings Indian Hospital for labor on June 9, 2011 and was a healthy 22-year old woman, *gravida* 2 *para* 1 at 36 3/7 weeks gestation with an uncomplicated prenatal course.

13.    At 2:10 a.m. on June 10, 2011, Plaintiff Lisa Wiggins' cervical exam was 6-7/70/-2, which meant that she was in the early stages of labor.  By 4:25 a.m., she had no further cervical change and was started on ocytocin, a medication used to cause labor to progress.  At 6:40 a.m., her oxytocin dose was 10 mu/min.  At 7:45 a.m., her cervical exam was noted to be 7-8/100/-2, which reflected some progress. By 9:45 a.m., Lisa Wiggins' oxytocin was increased to 18 mu/min and the  cervical exam revealed 9/100/-1.

14.    Lisa Wiggins' fetal heart rate tracing (or monitoring strips) began showing decelerations before 8:00 a.m.  By 9:20 a.m., the fetal heart monitor showed decelerations with nearly every contraction.  From 9:20 a.m. through 9:50 a.m. the fetal heart monitor showed that Lisa Wiggins was experiencing tachysystole (contraction frequency greater than every 2 minutes) and hyperstimulation (tachysystole plus fetal heart rate decelerations).

15.    Lisa Wiggins' fetal heart monitor showed a prolonged deceleration at about 9:37 a.m. with only a slow resolution of the fetal heart rate from a rate in the 90's back up to the 110's

between 9:43 a.m. and 9:48 a.m.  From 9:50 a.m. to 10:30 a.m., the baseline fetal heart rate rose slowly from the 110's to the 150's.  Further, the variability between deceleration transitioned to minimal by 10:30 a.m.  Lisa Wiggins' contractions through this time frame continued to be more frequent than every 2 minutes.  Between 10:30 a.m. and 11:00 a.m., the fetal heart tracing continued to be non-reassuring with repetitive fetal heart rate decelerations and minimal variability between decelerations and an even further rising baseline up to the 170's by 11:10 a.m.  The fetal heart monitor showed that the contractions were so frequent that the fetal heart rate was still rising when the next deceleration began.

16.    At 11:09 a.m., Lisa Wiggins was instructed to begin pushing.  From 11:10 a.m. until 11:35 a.m., the fetal heart rate monitor showed recurrent, deep decelerations.  From 11:36 a.m. until just before delivery at 12:04 p.m., the fetal heart rate monitor demonstrated a persistent bradycardiac rate in the 80-90 beats per minute range.  There appears to have been no fetal heart rate from approximately 11:57 a.m. until delivery.

17.    At 11:55 a.m., Dr. Davis came in and ordered that the oxytocin discontinued and that Lisa Wiggins' be monitored expectantly for the next 20 minutes.  She delivered her baby before any second visit from Dr. Davis.

18.    Plaintiffs Lisa Wiggins and Patrick Chapman's son, Corbyn, was born at approximately 12:04 p.m. with no evidence of cardiac activity.  Corbyn's Apgar scores were 0, 1, and 1 at 1, 5, and 10 minutes respectively.

19.    After resuscitation, Corbyn began having seizures.  He had severe hypoxic ischemia and was transferred *via* Life Flight to the NICU at the Children's Hospital of Saint Francis in Tulsa.  At St. Francis, Corbyn was noted to be admitted with birth depression and birth asphyxia with monitored fetal distress with decelerations.  Hospital records reflect the baby was

actively seizing and was started on Ativan.  On June 15, 2011, after a neurology consult, Lisa and Patrick were informed that Corbyn's medical condition was futile.

20.     Plaintiffs Lisa Wiggins and Patrick Chapman spent the evening of June 15, 2011 with their baby Corbyn, before having to say goodbye and to let him go on June 16, 2011 when life-support was removed.

21.     Baby Corbyn's autopsy revealed wide-ranging hypoxic ischemic damage to his brain, heart, kidneys and liver.  There is no indication of any deformities or infectious process that caused Baby Corbyn's injury and death.  The autopsy report states,

> In summary, this autopsy revealed severe acute to subacute hypoxic-ischemic changes in the brain and other organs with evidence of a systemic response to hypoxic stress.  There were no specific features of longstanding or chronic in-utero stress, and no congenital cardiac malformations, evidence of intrauterine infection, or other major anatomic fetal of placental abnormalities were found to account for sudden intrapartum demise.

22.     From at least 9:20 a.m. on June 11, 2011, Ms. Wiggins had tachysystole and then hyperstimulation due to the administration of oxytocin.  The occurrence of contractions more often than every 2 minutes was documented by Nurse Gunter beginning at 8:30 a.m. on the Labor Progress Chart.  The labor and delivery nurse(s) also documented decelerations beginning at 10:00 a.m., though they actually started earlier as evidenced by the fetal monitoring strips.

23.     Despite the evidence of tachysystole and hyperstimulation along with frequent, prolonged and repetitive fetal heart rate decelerations, Defendants' health care providers did not reduce or discontinue the oxytocin until far too late.  In fact, contrary to the medical signs available, the dosage of oxytocin was increased.

24.    Both the C.N.M. and/or labor and delivery nurse(s) should have decreased or discontinued the oxytocin long before it was ordered stopped based on the medical signs available to them over the course of Lisa Wiggins' labor.

25.    Moreover, given the medical signs apparent before them, Defendants' health care providers should have ordered an emergency operative delivery long before Lisa Wiggins was finally able to deliver Corbyn.

26.    The obstetrical attendant in this case, Gina Cole, C.N.M., breached the standard of care.  Her actions and inactions directly led to the injury and ultimate death of Corbyn.  She allowed the oxytocin to continue in the face of repetitive fetal heart rate decelerations and uterine hyperstimulation.  Further, she did not deliver Ms. Wiggins' baby emergently in a timely manner or even call for back-up until too late.

27.    The labor and delivery nurses, Rhonda Gunter, R.N. and Rachel Dick, R.N., also allowed the oxytocin to continue even in the fact of repetitive fetal heart rate decelerations and uterine hyperstimulation.  Further, Nurse Gunter did not encourage immediate delivery in a timely manner in light of the apparent medical signs.  The practice of these labor and delivery nurses also violated the standard of care and proximately led to the injury and ultimate death of baby Corbyn.

28.    The care provided by Dr. Davis also violated the standard of care as immediate delivery should have been accomplished consistent with the objective indications of serious trouble available at the time.  Instead, Dr. Davis failed to properly monitor and treat Ms. Wiggins and baby Corbyn, and inexplicably left the room with instructions to continue to monitor Ms. Wiggins for another 20 minutes after being in the room and seeing her at approximately 11:55 a.m. on June 11, 2011.

29.     But for the negligence, errors and omissions of Defendants' health care providers, Baby Corbyn would not have suffered birth asphyxia, injuries and death.  The indications of fetal distress and the need to take action were available and apparent to Defendants' health care providers.  Yet, no actions were taken which could have prevented injury to Corbyn and prevented his death.

## COUNT 1:  CLAIM FOR NEGLIGENCE, SURVIVOR, AND WRONGFUL DEATH PURSUANT TO 12 O.S. §§ 1051, 1053, and 1055.

30.     Plaintiffs adopt and reallege paragraphs 1 through 29 as if fully set forth herein.

31.     Defendants, by and through their agents, apparent agents, employees, servants, representatives and contractors had undertaken duties to provide proper care to Lisa Wiggins, Patrick Chapman, and to their child, Corbyn Wiggins-Chapman, with that level of care, skill and treatment that is recognized as acceptable and appropriate by reasonably prudent similar health care providers.

32.     Notwithstanding the duties undertaken by Defendants' health care providers, they breached their duties to Plaintiff Lisa Wiggins, Patrick Chapman, and to their child, Corbyn Wiggins-Chapman, *inter alia*, by engaging in the following acts or omissions, all of which deviated from and fell below the accepted standard of medical and nursing care and treatment, including but not necessarily limited to:

(a)     by negligently and carelessly failing to provide proper care to Plaintiff Lisa Wiggins, Patrick Chapman, and Corbyn Wiggins-Chapman, in that these health care providers did not meet the level of care, skill, and treatment that is recognized as acceptable and appropriate by reasonably prudent similar health care providers;

8

(b)     by negligently and carelessly failing to possess the requisite knowledge to appropriately practice obstetrics;

(c)     by negligently and carelessly failing to possess the requisite knowledge regarding appropriate measures to take in connection with Lisa Wiggins, Patrick Chapman, and Corbyn Wiggins-Chapman's care;

(d)     by negligently and carelessly failing to perform appropriate physical examinations and/or diagnostic tests, or to order that such examinations or tests be performed in connection with the birth of Corbyn Wiggins-Chapman;

(e)     by negligently and carelessly failing to take action to timely deliver Corbyn Wiggins-Chapman when it was medically inappropriate to fail to take action and at a time when the health, safety and life of the mother and child were jeopardized;

(f)     by negligently and carelessly failing to follow appropriate guidelines concerning care and supervision of a pregnant woman in labor;

(g)     by negligently and carelessly failing to follow appropriate guidelines concerning care and supervision of an unborn child exhibiting signs of fetal distress during labor;

(h)     by negligently and carelessly failing to adequately warn Plaintiffs Lisa Wiggins and Patrick Chapman of the danger of Corbyn's condition when he was showing signs of fetal distress during labor;

(i)     by negligently and carelessly failing to examine and/or monitor Lisa Wiggins and her unborn child during labor to ensure that Corbyn would not be medically compromised or injured;

(j)     by negligently and carelessly failing to consult with other physicians or health care providers in regard to the care and treatment rendered to Lisa Wiggins and her child, Corbyn Wiggins-Chapman;

(k)     by negligently and carelessly failing to use reasonable care in the management of Lisa Wiggins' labor and delivery of Corbyn Wiggins-Chapman;

(l)     by negligently and carelessly failing to prescribe, order, and/or perform indicated diagnostic procedures that would have revealed Corbyn's true condition and dictated a different course of care and treatment for him;

(m)     by negligently and carelessly failing to request consultation with appropriate medical specialists who would have prescribed, ordered, and/or performed procedures as to prevent fetal distress, oxygen deprivation, and physical damage to Corbyn Wiggins-Chapman;

(n)     by negligently and carelessly failing to properly diagnose, treat and monitor Lisa Wiggins' condition and that of her child, Corbyn Wiggins-Chapman.

33.     As a direct and proximate result of Defendants' health care providers' acts and/or omissions set forth above, Corbyn Wiggins-Chapman suffered bodily injury, pain, suffering and ultimately death.

34.     Additionally, as a direct and proximate result of Defendants' health care providers' acts and/or omissions set forth above, Lisa Wiggins suffered pain, suffering, mental anguish, loss of anticipated services and support, loss of companionship and love, destruction of the parent-child relationship, loss of monies, and expense.

35.     Moreover, as a direct and proximate result of Defendants' health care providers' acts and/or omissions set forth above, Patrick Chapman suffered pain, suffering, mental anguish, loss of anticipated services and support, loss of companionship and love, destruction of the parent-child relationship, loss of monies, and expense.

## COUNT 2: NEGLIGENT CRETIALING, TRAINING, RETENTION, AND SUPERVISION

36.     Plaintiffs incorporate paragraphs 1-35 as though fully set forth herein.

37.     The injuries suffered and damages sustained by Plaintiffs and their child, Corbyn Wiggins-Chapman, occurred, *inter alia*, as a direct and proximate result of the negligence of Defendants W.W. Hastings Indian Hospital, the United States of America, the Department of Health and Human Services, Public Health Services, and Indian Health Services (collectively hereinafter "W.W. Hastings").

38.     As the employer, principal, and/or master, W.W. Hastings had a duty to hire, train and entrust the care of patients to only competent and qualified employees, agents, and/or servants.  W.W. Hastings had a further duty to monitor its employees, agents, and/or servants. W.W. Hastings' actions and omissions, when viewed in their totality and compared with reasonably accepted standards, must be characterized as unacceptably deficient.  The acts and omissions complained of herein include, but are not limited to, the following:

a)     W.W. Hastings' failure to hire, train and/or supervise capable and/or competent employees, agents and/or servants, including but necessarily not limited to, Dr. Sean Davis, Gina Cole, C.N.M., Rhonda Gunter, R.N., and Rachel Dick, R.N.; and

11

b)    W.W. Hastings' entrustment of patient care to such incompetent employees, agents and/or servants, including but necessarily not limited to, Dr. Sean Davis, Gina Cole, C.N.M., Rhonda Gunter, R.N., and Rachel Dick, R.N., whom Defendant W.W. Hastings knew or reasonably should have known were not capable or competent to provide health care services in a safe manner.

39.    As a direct and proximate result of the negligence of W.W. Hastings,' Plaintiffs Lisa Wiggins, Patrick Chapman, and baby Corbyn Wiggins-Chapman, suffered injuries, death, and damages as set forth herein above in Paragraphs 33-35.


## COUNT 3: NEGLIGENCE AND OSTENSIBLE AGENCY

40.    Plaintiffs incorporate paragraphs 1-39 as though fully set forth herein.

41.    The injuries and damages suffered by Plaintiffs Lisa Wiggins, Patrick Chapman, and baby Corbyn Wiggins-Chapman occurred as a direct and proximate result of the negligence of the W.W. Hastings Defendants.  Plaintiffs relied upon W.W. Hastings to provide proper and professional medical care, monitoring, evaluation and treatment, and were unsuspecting that W.W. Hastings permitted and encouraged incompetent and incapable healthcare providers to provide medical and health care services within its walls.  The conduct of W.W. Hastings when viewed in its totality and compared with reasonably accepted standards must be characterized as deficient.  The acts and omissions complained of herein include but are not limited to the following:

a)    W.W. Hastings breached its non-delegable duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for its patients;

12

b)      W.W. Hastings failed to ensure adequate and competent staffing to provide proper care for its patients;

c)      W.W. Hastings breached its non-delegable duty of care to properly credential, monitor, supervise and proctor its employees, agents and/or servants, including but necessarily not limited to, Dr. Sean Davis, Gina Cole, C.N.M., Rhonda Gunter, R.N., and Rachel Dick, R.N., to whom it granted privileges when it knew or should have known that said employees, agents and/or servants were not capable or competent to provide the kind of care necessary to treat Plaintiffs and baby Corbyn Wiggins-Chapman; and

d)      W.W. Hastings is liable for the negligence of its employees, agents and/or servants, including but necessarily not limited to, Dr. Sean Davis, Gina Cole, C.N.M., Rhonda Gunter, R.N., and Rachel Dick, R.N., who were reasonably understood and believed to be the agent or ostensible agent of W.W. Hastings.

42.      As a direct and proximate result of W.W. Hastings' (and its ostensible agents, including but necessarily not limited to, Dr. Sean Davis, Gina Cole, C.N.M., Rhonda Gunter, R.N., and Rachel Dick, R.N.'s,) negligence, Plaintiffs and baby Corbyn Wiggins-Chapman suffered injuries and damages as set forth above in Paragraphs 33-35.

**WHEREFORE**, Plaintiffs Lisa Wiggins and Patrick Chapman, both individually and as parents and next friends of Corbyn Wiggins-Chapman, a minor, deceased, pray for and demand judgment on their claims against Defendants as follows:

13

(a)     damages in the amount of $3,750,000.00;

(b)     costs of this action;

(c)     interest as allowed by law;

(d)     reasonable attorney's fees as allowed by law; and

(e)     such other and further relief as this Court deems just and proper.

Respectfully submitted,

By:_____

Michael L. Barkett, OBA #16171
THE BARKETT LAW FIRM, PLLC
1408 South Harvard Avenue
Tulsa, Oklahoma  74112
918.582.6900 – Telephone
918.582.6907 – Facsimile
mbarkett@barkettlaw.net
*Attorneys for Plaintiffs*